**In re: CATALINA CRUISES, INC., In the matter of the petition of Catalina Cruises, Inc., as owners of the motor vessel "Catalina Countess" for exoneration from or limitation of liability.**

**CATALINA CRUISES, INC., Petitioner–Appellant,**

**v.**

**Julie LUNA; Bartolome Alcala; Lisa Bolton; Monique Brown; Sylvia Brown; Dawn Dyer; William Groves; Edward Pierce; Melony Pierce; Anthony Tidwell; James Tolbert; Sharon Washington; Caprice Winstead; Luke Brunet; Dena Deck; Kirsten Deck; Alex Heidharian; Kamran Heidharian; Megashia Jackson; Darryl King; Ana Munoz; Jan Tsjioe; Elisa Ugarte; Joe Yuan; Kevin Young; Tyrone Young; Bartolome Al-**

---

cala; Valerie A. Jordan; Cleveland Washington; Toni Washington; Wayne Laird; Adolphus Edmond, Claimants–Appellees.

No. 96–56217.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1997.

Decided March 10, 1998.

Walter Klein, Wilner, Klein & Siegel, Beverly Hills, CA, for Petitioner–Appellant.

Steven Unger, Law Offices of Steven H. Unger, Beverly Hills, CA, for Claimants–Appellees.

Before: FLOYD R. GIBSON,* KOZINSKI, and TROTT, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge:

Catalina Cruises, Inc. ("Catalina Cruises") appeals the district court's judgment, following a bench trial, that Catalina Cruises operated its passenger-carrying vessel, the M/V CATALINA COUNTESS (the "COUNTESS"), in a negligent manner. We affirm.

---

* The Honorable Floyd R. Gibson, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

## I. BACKGROUND

The COUNTESS is a 127-foot passenger vessel, inspected and certified by the Coast Guard for operation between Long Beach, California and Catalina Island. The COUNTESS is certified to carry a maximum of 793 passengers. The vessel consists of an enclosed main deck; a first deck with both open and enclosed portions; and a second deck which is fully unenclosed.

On April 24, 1994, the COUNTESS was under the command of Captain Donald Martin, an experienced vessel "master" or "operator" who had been licensed by the United States Coast Guard for thirty years. That morning, he reported for work, prepared the vessel for crossing, and checked the weather. The National Oceanic and Atmospheric Administration ("NOAA") forecast called for winds from the west to northwest at 15–25 knots, with five foot seas, and swells from the west at a height of five feet. The marine weather forecast for the morning called for a small craft advisory. The First Mate, Denny Dennis, noted that it was windy with turbulent sea conditions.

The COUNTESS left Long Beach at approximately 9:00 a.m. The vessel arrived in Avalon, on Catalina Island, at 10:55 a.m., and all passengers disembarked. The COUNTESS then made its way north along the Catalina coast to Toyon Bay, where 121 passengers boarded. The group consisted primarily of campers and their chaperons. At 11:55 a.m., the vessel returned to Avalon where 198 additional passengers boarded. Dennis met with the chaperons to inform them that the crossing would be "rough." The whitecaps in the channel were more prevalent than they had been in the morning crossing, indicating a significant increase in wind speed. Captain Martin did not contact the Harbor Master in Avalon for a more recent weather report prior to leaving Avalon. The COUNTESS began its return trip to Long Beach at approximately 12:25 p.m.

Captain Martin sailed north up the coast of Catalina toward Long Point. This route allowed the COUNTESS to travel in the lee of the island until, by executing a starboard turn, Captain Martin could travel "downhill" with the swells. It was his intention to keep the wind, waves, seas and swells primarily on the aft port quarter, resulting in a more comfortable ride for the passengers, as opposed to the direct course from Avalon to Long Beach, which was the regular route. At 12:45 p.m., the COUNTESS was approximately one and one-half miles off Long Point. It was then that Captain Martin began to execute the starboard turn to head for the mainland.

Before the COUNTESS had cleared the lee of the island, Dennis had been in radio communication with the captain of a passing sister ship, the CATALINA MONARCH, which was on its way to Avalon, having left Long Beach at 12:00 p.m. with no passengers. The captain of the MONARCH informed Dennis that the ride from Long Beach had been miserable, relating that the MONARCH had, mid-channel, experienced winds from the west at 30–35 knots and heavy seas and swells from the west at eight to twelve feet high. Dennis did not relay this information to Captain Martin.

On the COUNTESS's return trip, the wind blew at speeds of 25–30 knots from a west, northwest direction, with occasional gusts of up to 35 knots, and waves ranging from five to ten feet high could be seen breaking against the vessel. Although Captain Martin was not monitoring the NOAA weather channel during the trip, he observed that the weather conditions had deteriorated from those seen during the morning crossing. Dennis testified that the weather was very windy and that the swells were almost on the beam of the vessel, causing the COUNTESS to roll at angles from 20 to 30 degrees.

Several claimants testified that the vessel experienced bad rolls for approximately thirty minutes before a huge wave struck the vessel and broke a window. The waves that were breaking on the vessel ranged in estimated height from five to ten feet. Just before the window broke, a set of larger and more violent swells descended upon the beam of the COUNTESS, causing the vessel to roll severely several times. A larger wave then struck the COUNTESS broadside, causing the window to shatter.

Passengers seated on the unenclosed portion of the first deck were washed from their seats, and the force of the water carried them across the deck. Some passengers on the main deck, where the window shattered, were also washed from their seats. As the swell passed under the port side of the ship, the vessel lurched hard back to starboard, throwing a number of passengers not struck by the water onto the deck.

Upon learning of the broken window and passenger injuries, Captain Martin immediately reduced the speed of the vessel, obtained a first aid kit, and turned the helm over to Dennis. Captain Martin then went to the main deck to survey the damage and administer first aid. Approximately ten minutes later, while in the midst of surveying the decks, Captain Martin radioed Dennis and instructed him to alter course so that the vessel would be headed in a more easterly direction. This alteration immediately alleviated the severity of the rolling, and the ride became much smoother.

On August 10, 1994, Catalina Cruises filed a petition seeking limitation of or exoneration from liability pursuant to 46 U.S.C.App. §§ 181–196 (1994), and Rule F of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty and Maritime Claims. Magistrate Rupert J. Groh, Jr. directed all potential claimants to file their claims by October 10, 1994. Thirty-two claimants filed, contending that Catalina Cruises negligently operated the COUNTESS. Following a bench trial, Senior District Judge A. Andrew Hauk determined that Catalina Cruises operated the COUNTESS in a manner which breached its duty of care to the passengers. The issues of causation and damages are to be determined in a later trial. Catalina Cruises appeals the district court's finding that it breached its duty of care. We affirm.

## II. DISCUSSION

 On appeal, Catalina Cruises claims that the district court failed to apply the correct standard of care,[1] and that, under the correct standard of care, Captain Martin's handling of the COUNTESS was reasonable under the circumstances. We review a district court's finding of negligence for clear error. *See Ludwig v. Pan Ocean Shipping Co.*, 941 F.2d 849, 850 (9th Cir.1991). "The question whether the district court applied the proper standard of care, however, is one of law and is, therefore, subject to de novo review." *Id.*

We conclude that the district court applied the proper standard of care. The district court correctly noted that a shipowner owes a duty of reasonable care to those aboard the ship who are not crew members. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S.Ct. 406, 409–10, 3 L.Ed.2d 550 (1959). In *Kermarec*, the Supreme Court held that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." *Id.* at 632, 79 S.Ct. at 410; *accord Morton v. De Oliveira*, 984 F.2d 289, 291 (9th Cir.), *cert. denied*, 510 U.S. 907, 114 S.Ct. 289, 126 L.Ed.2d 238 (1993).

 The degree of care required is always that which is reasonable, but the application of reasonable will of course change with the circumstances of each particular case. The Second Circuit has described the standard accurately:

What is required ... is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances, demanding only an increased amount of care. In some instances, reasonable care under the circumstances may be a very high degree of care; in other instances, it *may* be something less.

*Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 170–71 (2d Cir.1983) (internal quotations and citations omitted). The district court correctly determined that the standard of care is one of reasonableness, but in a situation such as this, where the risk is great because

---

1. Catalina Cruises argues that, rather than applying the standard of reasonable care under the circumstances, the district court's language indicates that it applied a much higher standard of care, and as a result held Catalina Cruises to a standard of almost absolute liability.

**1426**

of high seas, an increased amount of care and precaution is reasonable.

■ Furthermore, the district court's finding that Catalina Cruises breached this standard of reasonable care is not clearly erroneous. The crew of the COUNTESS had significant information regarding the weather they would encounter when crossing. The conditions had steadily deteriorated throughout the morning hours and had not shown any signs of improving. Captain Martin and Dennis were aware that the crossing would be rough and that they could be facing rather severe wind gusts. Knowing all this, Captain Martin ventured into this weather with over 300 passengers on board, many of them young campers.

During the voyage, the MONARCH radioed the COUNTESS and informed Dennis that the MONARCH'S crossing had been miserable. Dennis failed to inform Captain Martin of the conditions the MONARCH reported. The COUNTESS continued to encounter rough seas, until a large wave caused one of the vessel's windows to shatter. After the window shattered, and water literally washed many passengers from their seats, Captain Martin slowed the vessel and changed course so the ride would be more comfortable. Many on board noticed an extreme change in the smoothness of the ride.

A person exercising reasonable care under the circumstances would have slowed the vessel sooner, sought refuge at Long Point once he realized the severity of the conditions, or decided not to risk venturing out into the hazardous conditions at all. Accordingly, we hold that the district court did not commit clear error in determining that Catalina Cruises did not act with reasonable care under the circumstances of this case.

## III. CONCLUSION

Because we conclude that Catalina Cruises did not act with reasonable care under the circumstances of this case, the district court's judgment is AFFIRMED.

AFFIRMED.