UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DEIRDRE LYNN HURD, as Personal
Representative of the Estate of
Bobby Lee Hurd, Jr., deceased;
MARY E. MOORE CORNETT, as
Personal Representative of the
Estates of Michael Paul Cornett,
deceased; Michael Wayne Cornett,
deceased; and James Daniel Cornett,
deceased,

          *Plaintiffs-Appellees,*

          v.

UNITED STATES OF AMERICA,
          *Defendant-Appellant.*

No. 01-1680

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
David C. Norton, District Judge.
(CA-99-240-2-18, CA-99-241-2-18, CA-99-242-2-18,
CA-99-243-2-18)

Argued: January 22, 2002

Decided: April 25, 2002

Before WILKINS and NIEMEYER, Circuit Judges, and
Catherine C. BLAKE, United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed by unpublished opinion. Judge Blake wrote the opinion, in
which Judge Wilkins joined. Judge Niemeyer wrote a dissenting opin-
ion.

**COUNSEL**

**ARGUED:** Debra Joan Kossow, Senior Admiralty Counsel, Torts Branch, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Gedney Main Howe, III, LAW OFFICES OF GEDNEY M. HOWE, III, P.A., Charleston, South Carolina, for Appellees. **ON BRIEF:** Robert D. McCallum, Jr., Assistant Attorney General, Scott N. Schools, United States Attorney, Michelle T. Delemarre, Trial Attorney, Torts Branch, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Dennis J. Rhoad, Charleston, South Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

BLAKE, District Judge:

In the early morning hours of December 29, 1997, the S/V MORNING DEW sank after colliding with the north jetty leading into the Charleston Harbor. None of the passengers onboard the thirty-four foot sailboat survived. Their personal representatives brought suit against the United States Coast Guard under, *inter alia*, the Suits in Admiralty Act, 48 U.S.C. §§ 741-752. Following a bench trial, the district court entered judgment in favor of the plaintiffs. For the reasons stated below, we affirm the judgment of the district court.

I.

On December 26, 1997, Michael Wayne Cornett, his two teenaged sons, Michael Paul Cornett and James Daniel Cornett, and a cousin, Bobby Lee Hurd, set sail in the MORNING DEW from Little River, South Carolina to Jacksonville, Florida. (J.A. 46-47.) Though intending to travel along the Intracoastal Waterway ("ICW"), they inadver-

tently entered the open sea. (*Id.* at 47.) At approximately 2:17 a.m. on December 29, 1997, the MORNING DEW struck the north jetty leading into the Charleston Harbor. (*Id.*) There were no eyewitnesses to the accident and no survivors. (J.A. 47-48.)

From the evidence adduced at trial, the district court found it likely that Mr. Cornett, who was probably steering the boat at the time of the collision, was thrown overboard on impact and drowned shortly thereafter. (J.A. 76.) At approximately 2:18 a.m., James Daniel Cornett, the youngest of the children onboard the vessel, sent out a Mayday call on the international maritime distress and hailing frequency, stating, "Mayd . . . Mayday, U.S. Coast Guard, come in." (J.A. 697.) The call was received by Petty Officer Shelley, the watchstander on duty at the United States Coast Guard Charleston Operations Center.[1] (J.A. at 54-55.) Shelley immediately attempted to make contact with the caller, but was unsuccessful. (*Id.*) Four minutes later, another call from a similar voice was received. (*Id.*) Again, Shelley tried unsuccessfully to contact the caller. (*Id.*) Shelley did not log in the calls, nor did he inform his supervisor of the Mayday calls until after the boys' bodies were found. (*Id.*)

At approximately 6:10 a.m., Gerald Lucas of the Charleston Harbor Pilots Association was piloting the M/V PEARL ACE when he was told that a boatswain onboard had heard someone screaming for help off the starboard side near buoy 22. (J.A. 128-29, 703-04.) Mr. Lucas reported this information to the Pilots' Office, which contacted the Charleston Coast Guard Operations Center. (J.A. 129, 699, 703.) Petty Officer Shelley received the call. (*Id.* at 699.) The Pilots' Office told Shelley someone was heard yelling for help in the waters near buoy 22, and a pilot boat was returning to the area to search.[2] (*Id.*,

---

[1]In his deposition, Officer Shelley claimed he heard only the words "U.S. Coast Guard, U.S. Coast Guard," stated in a teenager's voice, when the first call came in. He did not, however, rewind the tape to further determine the contents of the call. After listening to the tape, the district judge found it not credible that Shelley did not hear the "Mayday" portion of the call. (J.A. 55 n.10.)

[2]The transcript of the 6:27 a.m. conversation between the Pilots' Office and Officer Shelley reads:

J.A. 298.) Shelley confirmed the location of the distress and the number of boats going back to search, and requested a call back with whatever information was found. (*Id.*) After fully briefing Operations

---

[Ringing]

*Shelley*: Coast Guard Communications, this is Petty Officer Shelley speaking.

*Pilots' Office*: Hey good morning, this is the Pilot Office.

*Shelley*: Yes.

*Pilots' Office*: How are you doing?

*Shelley*: Pretty good, how about yourself?

*Pilots' Office*: Ok. Um, we got a pilot inbound, um, on a car carrier and he just passed 22 buoy, you know right inside the harbor.

*Shelley*: Uh huh, twenty, uh.

*Pilots' Office*: Twenty Two.

*Shelley*: Two. Ok.

*Pilots' Office*: And, uh, the boatswain on ship radioed to the bridge that he heard somebody yelling for help and the pilot boats have gone, the pilot boat was here at the dock, they've gone back out to look around, but the pilot wanted me to call you to let you know what was going on, like I said, we've got the pilot boat out there looking for somebody now.

*Shelley:* They weren't able to talk to them any.

*Pilots' Office*: Well no, it was somebody in the water.

*Shelley*: Oh, somebody in the water.

*Pilots' Office*: Yeah, that's what they think.

*Shelley*: Oh, I see.

*Pilots' Office*: Um, so the pilot boat, they were just getting up here to the dock but they turned around and went back out to 22 to look around, what they're going to find I don't know.

*Shelley*: Ok, how many, which pilot boat went out there?

*Pilots' Office*: *Carolina*, excuse me, wait a minute. We had problems with the boats last night. *Palmetto State*.

Duty Officer Sass (Shelley's supervisor) and Officer Hartzog about the call from the Pilots' Office, Officer Shelley went off duty. (J.A. 180-81, 194, 280, 283, 295-96, 303, 657-60.)

Officer Sass, upon confirming the location of buoy 22 on a chart, decided to wait for the return call from the pilot boat. (J.A. 179, 825-26.) At approximately 6:48 a.m., the Pilots' Office called back and reported that nothing had been seen or heard during the search. (J.A. 699-700.) Officer Sass, despite a "confirmed distress call," took no further action. (J.A. 573-74, 639, 821.)

The sun rose on December 29, 1997 at approximately 7:22 a.m. At 11:15 a.m., the Coast Guard was notified that the bodies of James Daniel Cornett and Bobby Lee Hurd had been found floating in the water off the coast of Sullivan's Island. (J.A. 712.) By 1:00 p.m., Paul

---

*Shelley: Palmetto State.*

*Pilots' Office*: But I guess once they get back to 22, I can call you back and let you know what they see or hear, but I don't even . . .

*Shelley*: Ok, ok, well, I'll alert the station and they'll determine if they want to get underway also.

*Pilots' Office*: Oh, ok. Well, I can, if you want, I can call you back once they get out there to buoy 22 and see what they find.

*Shelley*: Ok, could you.

*Pilots' Office*: Yeah, yeah.

*Shelley*: Alright.

*Pilots' Office*: Okidoke.

*Shelley*: Great, what's your name again.

*Pilots' Office*: Its Johnny.

*Shelley:* Ok Johnny. *** at the pilot's office.

*Pilots' Office*: Right.

*Shelley*: Ok. Alright, thanks. Thank you.

[Hang up]

Cornett's body had also been discovered. Approximately twenty-six days later, the body of Michael Wayne Cornett was found washed ashore.

The plaintiffs commenced this action against the United States Coast Guard under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* and, alternatively, as a claim in admiralty under the general maritime law, 28 U.S.C. § 1333, the Suits in Admiralty Act, 48 U.S.C. §§ 741-752, and the Public Vessels Acts, 46 U.S.C. §§ 781-790. Following a two-day bench trial, the district judge issued thorough findings of fact and conclusions of law. The court concluded that the Coast Guard undertook to render aid to the passengers of the MORNING DEW by using the pilot boat that returned to the area of buoy 22 as a search asset. (J.A. 63, 65, 97.) The court further held that the failure of the Coast Guard to take further action after receiving the pilot boat's report constituted a termination of the search. (J.A. 71-73, 97.) Concluding that the termination was wanton and reckless, and also worsened the decedents' positions, the court awarded damages to decedents' representatives in the total amount of $18,957,563.89 for the deaths of the children on board the MORNING DEW.[3] (J.A. 98-99, 103-08.)

The United States claims the district court erred in (1) finding that the Coast Guard undertook to render aid to the decedents; (2) applying the wanton and reckless standard in determining whether the Coast Guard was liable to the plaintiffs; and (3) concluding that the Coast Guard's conduct was wanton and reckless, and negligently resulted in a worsening of decedents' positions. Because we agree that the Coast Guard undertook a search and rescue, and that it was wanton and reckless in terminating that effort, and thereby worsened the positions of the Cornett children and Bobby Lee Hurd, we affirm the rulings of the trial court.

---

[3]The trial judge found that the Coast Guard could not have saved Mr. Cornett because he was probably thrown overboard and drowned when the MORNING DEW hit the jetty. Plaintiffs were not, therefore, awarded damages for the death of Michael Paul Cornett. (J.A. 53, 76.)

## II.

The Coast Guard is authorized to "perform any and all acts necessary to rescue and aid persons and protect and save property." 14 U.S.C. § 88(a)(1). The statute does not, however, impose an affirmative obligation on the Coast Guard to undertake the rescue of persons in distress. *Kelly v. United States*, 531 F.2d 1144, 1147-48 (2nd Cir. 1976); *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 195 (1st Cir. 1967); *Albinder v. United States*, 703 F.Supp. 246, 247 (S.D.N.Y. 1987); *Wright v. United States*, 700 F. Supp. 490, 494 (N.D. Cal. 1988); *Daley v. United States*, 499 F.Supp. 1005, 1009 (D. Mass. 1980). Whether there has been an attempt to render aid is a question of fact in each case. *Furka v. Great Lakes Dredge & Dock Co.*, 755 F.2d 1085, 1088 (4th Cir. 1985) (*Furka I*). We review a district court's findings of fact for clear error pursuant to F.R.C.P. 52(a). *See Scrimgeour v. Internal Revenue*, 149 F.3d 318, 324 (4th Cir. 1998). A finding is clearly erroneous if "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (*citing United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). "'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Id.* (*quoting Zfass v. C.I.R.*, 118 F.3d 184, 188 (4th Cir. 1997)).

The United States first contends that the district court clearly erred in concluding that the Coast Guard attempted to aid plaintiffs' decedents. We disagree. The trial court found that the Coast Guard attempted to aid the MORNING DEW by using the pilot boat returning to buoy 22 as a search asset. (J.A. 63, 65, 97.) This conclusion is amply supported by the record. The Coast Guard received a report from a professional mariner that someone was heard yelling for help in the water near buoy 22. (J.A. 194, 298, 303, 657, 699.) Pursuant to the U.S. Coast Guard Search and Rescue Manual, the Coast Guard may use private resources in the course of rendering aid to mariners in danger.[4] (*See* J.A. 749, U.S. Coast Guard Addendum to the

---

[4]The U.S. Coast Guard Addendum to the National SAR Manual, Section 3.B.5.a, provides that an "immediate response will be initiated, if feasible, to any known situation in which the mariner is in imminent dan-

National SAR Manual, § 3.B.5.a.) Officers Shelley and Sass knew a pilot boat was returning to the area; indeed, Sass testified that a Coast Guard boat would have been launched if that had not been the case. (J.A. 800.) Moreover, according to Officer Sass, the pilot boat's rescue capabilities were the same as the Coast Guard's, and its crew's knowledge of the harbor area was probably better. (J.A. 810, 811.) Upon evaluating the fact that "we [*i.e.*, the Coast Guard] were able to get a competent mariner, being the pilot boat, back to the scene within minutes of us receiving the report," Sass decided to wait for the return call from the pilot boat. (J.A. 825-26, 475-76, 761.) According to Lt. Daponte, Sass's supervisor that night, Sass deemed his decision to rely on the pilot boat to check the area out "for us" [*i.e.*, the Coast Guard] an appropriate response. (J.A. 616, 637-39, 825-26.)

Relying primarily on *Daley v. United States*, 499 F. Supp. 1005 (D. Mass. 1980), the United States argues that these facts are insufficient to establish that the Coast Guard endeavored to render aid. In *Daley*, a party of four was stranded at sea when their motorboat capsized off Scituate Harbor. *Id.* at 1007. When the boat failed to return before nightfall, a family member reported their absence to the Coast Guard. *Id.* In response, the Coast Guard instituted a PRECOM (an inquiry of all harbor masters regarding whether they have seen or heard from a particular water vessel). *Id.* at 1008. Three hours later, the PRECOM had not been completed. After receiving two additional calls from frustrated family members, including a false report that members of the missing party were inexperienced boaters and had been drinking, the Coast Guard finally launched a search boat. *Id.* Unfortunately, the search effort was unsuccessful, and two of those missing perished before the others were rescued by a nearby mariner. *Id.* at 1009.

The widow of one of the decedents brought suit, alleging negligence by the Coast Guard in the delay of the search and the manner

---

ger. The response may be provided by regular Coast Guard resources, Coast Guard Auxiliary resources, or resources belonging to other federal, *private*, state, local, or *commercial* entities. The SMC (SAR Mission Coordinator) may use all sources of assistance in a distress situation without concern for private enterprise." (J.A. 62, 63 n.15, 749 (emphasis added).)

in which it was conducted. *Id.* at 1007. After noting that the Coast Guard could not be held liable even for an unreasonable delay because it had no affirmative duty to initiate a search, the *Daley* court considered whether sending out a PRECOM committed the Coast Guard to a duty of reasonable care. *Id.* at 1009. The court, in concluding that the institution of a PRECOM does not amount to an attempt to render aid (and does not, therefore, trigger a duty of due care), stated:

> The purpose of the PRECOM is to assist in determining whether to do anything further. Absent some promise or affirmative representation, of which there was none here, instituting a PRECOM commits the Coast Guard to nothing. Failure to follow it up is not comparable to abandoning a search that is already underway.

*Id.*

In this case, the trial court found that, unlike the Coast Guard in *Daley*, Sass and Shelley were past the information gathering stage after the first call from the pilot boat. This conclusion is not clearly erroneous, since Officers Sass and Shelley had specific reason to believe someone was in danger (given the report of a professional mariner that someone was heard yelling for help in the water), and they knew precisely where that danger was located (near buoy 22).[5] By comparison, the Coast Guard officers in *Daley* had only the non-specific information that the missing boaters had failed to return before dark when they instituted the PRECOM. They did not initiate a search until they actually had specific reason to believe someone might be in danger. *Daley*, 499 F. Supp. at 1007-08; *see also Mazzullo v. United States*, 1980 AMC 1038 (D.D.C. 1980) (Coast Guard officers did not begin searching because, though they knew someone was in danger, they did not know precisely where).[6] Accordingly, the

---

[5]Plaintiffs' expert, Captain Dein, testified at trial that in his professional opinion the case had already passed the PRECOM stage after the Coast Guard received the first call from the Pilots' Office. (J.A. 482-83.)

[6]The United States also relies upon *McLaughlin v. United States*, 671 F. Supp. 72 (D. Me. 1987), to support its contention that the district court clearly erred in finding that the Coast Guard attempted to render aid. *McLaughlin*, however, is distinguishable because the plaintiff there only alleged that the Coast Guard had negligently failed to initiate a search which, the court found, it had no duty to do.

district court was not clearly erroneous in finding that the Coast Guard endeavored to aid the passengers of the MORNING DEW through use of the pilot boat as a search asset.

### III.

We next address the Government's contention that the trial judge applied the wrong standard of care. Whether the appropriate standard of care has been applied is a question of law subject to *de novo* review. *Catalina Cruises, Inc. v. Luna*, 137 F.3d 1422, 1425 (9th Cir. 1998); *Theriot v. United States*, 245 F.3d 388, 394-95 (5th Cir. 1998); *Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603, 606 (1st Cir. 1996). The trial court held that the Coast Guard would be subject to liability either for reckless or wanton conduct, or for negligence that worsened the position of the decedents. (J.A. 95-96). *See Berg v. Chevron U.S.A., Inc.*, 759 F.2d 1425, 1430 (9th Cir. 1985); *Furka I*, 755 F.2d at 1088; *Korpi v. United States*, 961 F. Supp. 1335, 1347 (N.D. Cal. 1997). The United States argues that the Coast Guard cannot be held liable for wanton and reckless conduct alone; rather, liability should ensue only if its conduct also worsened the decedents' positions. Since we agree with the trial judge's conclusions that the Coast Guard's conduct was wanton and reckless and that such conduct worsened the decedents' position, we need not resolve any dispute about the applicable standard in this particular case.[7]

---

[7]In *Furka I*, we stated, "If the [fact finder] finds plaintiff engaged in a rescue, there must be evidence of wanton or reckless behavior on plaintiff's part before any fault may be assigned." *Furka*, 755 F.2d at 1088. Other jurisdictions have extended *Furka*'s adoption of the wanton and reckless standard to the conduct of defendant rescuers as well. *See*, *e.g.*, *Berg*, 759 F.2d at 1430; *Korpi*, 961 F. Supp. at 1347; *DFDS Seacruises (Bahamas) LTD. v. United States*, 676 F. Supp. 1193, 1201 (S.D. Fla. 1987). The *Restatement*, on the other hand, provides:

One who undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if:

(a) his failure to exercise such care increases the risk of harm, or

IV.

We now turn to the district court's determinations that the actions of the Coast Guard were wanton and reckless, and worsened the positions of the children on the MORNING DEW. Whether a rescuer's conduct is wanton and reckless, and whether such conduct has worsened a victim's position, are questions of fact which must be reviewed for clear error.

As the district court properly noted, wanton and reckless conduct, also described as gross negligence, is a failure to use even a slight degree of care. (J.A. 96.) *See* Martin J. Norris, *The Law of Maritime Personal Injuries* § 9.4 (4th ed. 1990). The district court's conclusion that Officer Sass' termination of the search before sunrise was "the exercise of no care at all to whoever was in the water" (J.A. 97) is adequately supported by the evidence. The Coast Guard had a report from a professional mariner that someone was heard yelling for help, and they were aware that the pilot boat had searched the relevant area before dawn with negative results. Officer Sass, knowing that someone in the water would be in danger of serious bodily injury or death, made the decision to do nothing further without "ask[ing] any amplifying questions regarding search conditions, area searched, [or] visibility." (J.A. 203, 208, 727.) Although within his authority to do so, he also did not dispatch a vessel or instruct the pilot boat "to double check the area after sunrise." (J.A. 206-07, 727.) Coast Guard Commander William Lee, the Chief of the Search and Rescue Branch for

---

      (b) the harm is suffered because of the other's reliance upon
      the undertaking.

*Restatement (Second) of Torts* § 323 (1965); *see Patentas v. United States*, 687 F.2d 707, 714-15 (3d Cir. 1982). The Fifth Circuit described liability for negligent salvage as "limited to situations in which the salvor, through want of due care, has worsened the position of the victim." *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1021 (5th Cir. 1969). This opinion was cited with approval in *Furka I*, 755 F.2d at 1089; *see also Furka v. Great Lakes Dredge and Dock Company*, 824 F.2d 330, 332 (4th Cir. 1987) (*Furka II*). Any argument about whether *Furka I* and *II* clearly exclude application of the *Grigsby* standard to a maritime salvage case need not be addressed in this opinion.

the Fifth Coast Guard District and Atlantic Area,[8] specifically con-
cluded in his report on the MORNING DEW case that "the search
should *not* have been allowed to terminate before first light." (J.A.
732) (emphasis in original). Richard Dein, the plaintiffs' expert, testi-
fied that Sass should have done the exact opposite of what he did, and
characterized Sass's decision to stop searching as the exercise of no
care at all to the decedents. (J.A. 512-13, 520.) The Government's
own expert, Admiral Peschel, conceded the latter point in his deposi-
tion. (J.A. 587.) Thus, we cannot conclude that the district court com-
mitted clear error in finding that the Coast Guard's conduct was
wanton and reckless.

There are two ways in which a rescuer can worsen the position of
the subject of the rescue. The first is by increasing the risk of harm
to the person in distress. *Restatement (Second) of Torts* § 323(a); *see
also Daley*, 499 F. Supp. at 1010 (*citing Sandra & Dennis Fishing
Corp.*, 372 F.2d at 195 (Coast Guard worsened position when it towed
an otherwise safe fishing vessel onto a shoal where it sank)). The sec-
ond is to induce reliance, either by the subject or other potential res-
cuers, on the rescuer's efforts. *Restatement* § 323(b); *see also United
States v. DeVane*, 306 F.2d 182, 186 (5th Cir. 1962); *United States
v. Gavagan*, 280 F.2d 319, 328-29 (5th Cir. 1960); *Fondow v. United
States*, 112 F. Supp.2d 119, 130 (D. Mass. 2000); *Daley*, 499 F.Supp.
at 1010 (*quoting Lacey v. United States*, 98 F. Supp. 219, 220 (D.
Mass. 1951)). The trial court concluded that the Coast Guard's actions
worsened the children's position in the second manner, *i.e.* "by induc-
ing the Pilot's association to cease their efforts in the belief that the
Coast Guard had the situation in hand." (J.A. 99.)

The trial court's determination is fully supported by the evidence
adduced at trial. The Coast Guard holds itself out to the public as
expert in maritime search and rescue. (J.A. 690.) It is, therefore, rea-
sonable for others to perceive members of the Coast Guard as experts
if they do not affirmatively disclaim competency in a particular case.
*See Daley*, 499 F. Supp. at 1010 (*citing DeVane*, 306 F.2d 182). Pilot
Lucas, based on the conversations between the Pilots' Office and the

---

[8]Commander Lee was the Chief of the Coast Guard's Atlantic Area
Command Center when he prepared the report on the MORNING DEW.
(J.A. 326.)

Coast Guard that he was made aware of that night, and his prior experience with the Coast Guard, testified that he expected the Coast Guard to launch a search boat. (J.A. 132-133.) Retired Admiral Sanders, plaintiffs' expert at trial, testified that in his professional experience he had not encountered cases where the Coast Guard had chosen not to respond, thereby validating the reasonableness of Lucas's expectation. (J.A. 691-92.) Lucas also stated that the pilot boat discontinued its search efforts because the pilots thought the Coast Guard was going to launch a boat. (J.A. 133, 142.) The president of the Charleston Harbor Pilots Association, Whitmarsh Smith, confirmed that the pilot boat would have done more had it known the Coast Guard was not coming. (J.A. 163.) Accordingly, we also conclude that the district court did not commit clear error in finding that the Coast Guard's termination of the search before daylight worsened the decedents' positions.[9]

V.

The judgments of the district court are therefore

*AFFIRMED*.

NIEMEYER, Circuit Judge, dissenting:

Because the Coast Guard neither undertook nor sponsored a search and rescue operation in this case and because, in any event, the Coast Guard was not shown to have been "wanton or reckless," I submit that it cannot be found liable for failing to rescue the Cornetts and young Bobby Lee Hurd from the deadly consequences of their tragic boating accident.

In the early morning hours of December 29, 1997, the Cornetts' boat struck a jetty outside of Charleston Harbor and sank. At 6:10 a.m., Harbor Pilot Gerald Lucas, who was at the helm of the *M/V*

---

[9]The United States has not challenged the district judge's finding of proximate cause, *i.e.*, that the children would have been rescued if the search by the Coast Guard or other mariners had continued. Accordingly, our review of the trial court's opinion does not reach that aspect of the case.

*Pearl Ace*, was told by a boatswain on the vessel that the boatswain had heard someone screaming for help near Buoy 22. Lucas communicated this information to the Office of the Harbor Pilots Association, which in turn passed the information on to the Coast Guard at 6:27 a.m. The material portions of the telephone conversation between the Pilots' Office and the Coast Guard were as follows:

> Pilots' Office: Ok. Um, we got a pilot inbound, um, on a car carrier and he just passed 22 buoy, you know right inside the harbor.
>
> CG: Uh huh, twenty, uh.
>
> Pilots' Office: Twenty-two.
>
> CG: Twenty-two. Ok.
>
> Pilots' Office: And, uh, the boatswain on ship radioed to the bridge that he heard somebody yelling for help and the pilot boats have gone, the pilot boat was here at the dock, they've gone back out to look around, but the pilot wanted me to call you to let you know what was going on, like I said, we've got the pilot boat out there looking for somebody now.
>
> CG: They weren't able to talk to them any.
>
> Pilots' Office: Well no, it was somebody in the water.
>
> CG: Oh, somebody in the water.
>
> Pilots' Office: Yeah, that's what they think.
>
> CG: Oh, I see.
>
> Pilots' Office: Um, so the pilot boat, they were just getting up here to the dock but they just turned around and went back out to 22 to look around, what they're going to find I don't know.

CG: Ok, how, many, which pilot boat went out there?

Pilots' Office: *Carolina*, excuse me, wait a minute, we had problems with the boats last night. *Palmetto State*.

CG: *Palmetto State*.

Pilots' Office: But I guess once they get back to 22, I can call you back and let you know what they see or hear, but I don't even . . .

CG: Ok, ok, well, I'll alert the station and they'll determine if they want to get underway also.

Pilots' Office: Oh, ok. Well, I can, if you want, I can call you back once they get out there to 22 buoy and see what they find.

CG: Ok, could you.

Pilots' Office: Yeah, yeah.

CG: Alright.

The Pilots' Office called back 20 minutes later and reported that nothing had been seen or heard from the location of Buoy 22, and the Coast Guard took no further action. These conversations were all of the objective facts relating to any "undertaking" by the Coast Guard to conduct a search and rescue operation, either directly or through the Pilots' Office.

In addition to transcripts of these conversations, evidence was presented at trial that if the Coast Guard had undertaken a search and rescue at the time it received the 6:27 call, some of the persons from the Cornetts' boat could have been saved.

The district court concluded that the Coast Guard had actually undertaken a search and rescue through the Office of the Harbor Pilots Association and that the failure to conduct a more comprehen-

sive search after the Pilots' Office reported that the pilot boat had found nothing near Buoy 22 was "wanton and reckless." Accordingly, it entered judgment in favor of the plaintiffs against the Coast Guard for $19 million. I submit that this decision is both alarming in substance and contrary to Fourth Circuit law.

While the Coast Guard is authorized to conduct search and rescue operations, it has no duty to do so. *Kelly v. United States*, 531 F.2d 1144, 1147-48 (2d Cir. 1976); *McLaughlin v. United States*, 671 F. Supp. 72 (D. Me. 1987). Only if the Coast Guard undertakes a search and rescue operation and conducts the operation wantonly or recklessly can it become liable for its conduct. *See, e.g., Furka v. Great Lakes Dredge & Dock Co.*, 755 F.2d 1085, 1088-89 (4th Cir. 1985) ("*Furka I*") (holding that if a search and rescue operation has been undertaken, "there must be evidence of wanton or reckless behavior on plaintiff's part before any fault may be assigned"); *see also Furka v. Great Lakes Dredge & Dock Co.*, 824 F.2d 330, 331-32 (4th Cir. 1987) ("*Furka II*") (same). In *Furka I*, we explained that "of all branches of jurisprudence, the admiralty must be the one most hospitable to the impulses of man and law to save life and limb and property. . . . Law must encourage an environment where human instinct is not insular but responds to the plight of another in peril." 755 F.2d at 1089 (internal quotation marks and citations omitted); *see also Furka II*, 824 F.2d at 332. We observed that a negligence standard, rather than a wanton-or-reckless standard, would inappropriately discourage rescue efforts.

In this case, there was no evidence that the Coast Guard undertook a search and rescue operation. Moreover, correctly applying the wanton-or-reckless standard of care, the Coast Guard could not be found liable simply because it did nothing.

First, relying on what the Coast Guard telephone operator was thinking or should have been thinking, rather than on what he said or what the Coast Guard did, the majority concludes that the Coast Guard had in some fashion undertaken a search and rescue operation through the efforts of the Pilots' Office. This conclusion could only have been grounded on the fact that the Coast Guard agreed to receive information of what the pilot boat would find after completing its already-begun search operation ("we've got the pilot boat out there

looking for somebody now"). The full evidence on which to find that the Coast Guard had undertaken an operation or commissioned someone else to undertake it must therefore be contained in the following portion of the 6:27 telephone call:

> Pilots' Office: Well, I can, if you want, I can call you back once they get out there to 22 buoy and see what they find.
>
> CG: Ok, could you.
>
> Pilots' Office: Yeah, yeah.
>
> CG: Alright.

To convert this conversation, in which the Coast Guard agreed only to receive information, into a Coast Guard sponsored search or rescue operation is simply unsupportable. And no case law can be found to construe such an agreement to receive information as the Coast Guard's undertaking of a search and rescue operation. Indeed, the cases whose facts are closest to these circumstances have found to the contrary — that the Coast Guard had not undertaken a search and rescue operation merely by seeking and receiving information. *See*, *e.g.*, *Daley v. United States*, 499 F. Supp. 1005 (D. Mass. 1980).

Furthermore, the entire 6:27 conversation is circumscribed by the Coast Guard's express statement limiting its role. Rather than saying that the Coast Guard would undertake a search and rescue operation or was authorizing the Pilots' Office to do so on its behalf, the Coast Guard telephone operator stated instead: "I'll alert the station *and they'll determine* if they want to get underway also." (Emphasis added). By indicating that it would determine later whether to get underway, the Coast Guard precluded an interpretation that it was then designating the Pilots' Office to act on its behalf. As we know, the Coast Guard never determined to "get underway" and therefore could not be held liable.

In addition, when the Pilots' Office called the Coast Guard, it had already, on its own, commenced a search, telling the Coast Guard, "they've gone back out to look around . . . we've got the pilot boat

out there looking for somebody now." It could hardly be concluded that the Coast Guard commissioned the Pilots' Office's search operation when the operation commenced before the Coast Guard even knew about it.

I would conclude, as a matter of law, that the 6:27 telephone conversation was insufficient to support a conclusion that the Coast Guard had sponsored a search and rescue operation. *See Daley*, 499 F. Supp. at 1009; *Mazzullo v. United States*, 1980 A.M.C. 1038, 1047 (D.D.C. 1979).

The district court also concluded that when the Pilots' Office reported 20 minutes later that the pilots had found nothing, the Coast Guard acted wantonly and recklessly when it did not go out on its own. The majority agrees with the district court, holding that by doing nothing, the Coast Guard somehow terminated the search and rescue purportedly undertaken by the Pilots' Office but not authorized by the Coast Guard. If the Pilots' Office had undertaken the search, it, not the Coast Guard, terminated the search. By doing nothing, the Coast Guard terminated nothing and was not wanton or reckless. In charging the Coast Guard with wantonness or recklessness, the majority imputed the Coast Guard with a duty it did not have, a duty that would arise *only* if the Coast Guard had actually undertaken a search and rescue operation which, as shown above, it did not do. If in fact the search and rescue was a joint effort of the Pilots' Office and the Coast Guard, neither knew that fact. Yet this purported joint effort improperly forms the basis of the majority opinion.

For the foregoing reasons, I respectfully dissent.