Kathleen STABLES, Administratix of the Estate of Kevin Stables, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 302CV532.

United States District Court, S.D. Ohio, Western Division.

Dec. 8, 2004.

Robert Gray Palmer, Palmer Volkema Thomas, Columbus, OH, for Plaintiff.

Victor M. Lawrence, US Department of Justice, Washington, DC, for Defendant.

## ENTRY AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (Doc. # 35); TERMINATION ENTRY

ROSE, District Judge.

This matter arises from the death of Kevin Stables in the crash on February 16, 2000, of an Emery World Airlines ("EWA") DC8–71F aircraft that he piloted. Plaintiff Kathleen Stables ("Stables") brings this action as Administratrix of the Estate of Kevin Stables.

Stables' action is brought against the United States of America (the "USA") pursuant to the Federal Tort Claims Act

("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 et seq. Stables claims that the Federal Aviation Administration (the "FAA") was negligent in its oversight and enforcement of regulations and that the FAA's negligence proximately caused Kevin Stables' death. A brief procedural history will first be set forth followed by the standard of review and an analysis of the motion that is now before the Court.

## PROCEDURAL HISTORY

Stables' Complaint was filed on November 13, 2002. On February 10, 2003, the USA filed a Motion To Dismiss. The USA sought to dismiss Stables' Complaint for lack of subject matter jurisdiction.

Stables was then granted until thirty (30) days after the National Transportation Safety Board (the "NTSB") issued its final report regarding the accident[1] to respond to the USA's Motion To Dismiss and the case was stayed. (Doc. # 11, 13.) On September 5, 2004, the case was reopened and a briefing schedule for the Motion To Dismiss was established. (Doc. # 15.)

Upon review of the briefs, the Court found that the determination of whether the FAA is entitled to the discretionary function exception to the FTCA is factually complex. The USA's Motion To Dismiss was, therefore, converted to a Motion for Summary Judgment regarding subject matter jurisdiction. (Doc. # 25.) Limited discovery and additional briefing was permitted and a schedule was established.

Next, pursuant to Stables' request, discovery was expanded and the time for discovery extended. (Doc. # 33.) In addition and at the request of the Court, the USA's Motion To Dismiss (Doc. # 4) was withdrawn with the understanding that the USA would refile this Motion and it would be converted to a Motion for Summary Judgment.

It is the USA's refiled Motion To Dismiss that is now before the Court. (Doc. # 35.) This Motion is now fully briefed and ripe for decision.

## STANDARD OF REVIEW

The USA argues that Stables' lawsuit falls within the discretionary function exception of the FTCA and must, therefore, be dismissed for lack of subject matter jurisdiction. The resolution of this Motion rests upon whether certain actions giving rise to Stables' claim fall under the discretionary function exception. Therefore, the facts prerequisite to showing jurisdiction also relate to the merits of Stables' case.

■ If the decision regarding the jurisdictional issue requires a ruling on the underlying substantive merits of the case, the decision should be addressed either by the court on a motion for summary judgment or by the finder of fact where there is a dispute of factual issues. 5B Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1350 (3d ed.2004); *Wright v. United States*, 82 F.3d 419, 1996 WL 172119 at *4 (6th Cir.1996). When the plaintiff fails to establish a genuine issue with regard to a fact essential to subject matter jurisdiction and to the merits of the claim, a court should grant summary judgment. *Wright*, 1996 WL 172119 at *4 (citing *Sierra Club v. Shell Oil Company*, 817 F.2d 1169 (5th Cir.1987), *cert. denied*, 484 U.S. 985, 108 S.Ct. 501, 98 L.Ed.2d 500 (1987)). Remaining genuine issues of material fact are for the finder of fact.

---

1. The final report is entitled "In the Matter of the Investigation of Emery Worldwide Airlines, Flight 17, McDonnell Douglas DC-6-71F, NS079U Rancho Cordova, California, 2/16/00 Docket # SA-521."

■ Therefore, the USA's Motion To Dismiss has been converted to a Motion for Summary Judgment and the parties have been allowed to conduct discovery, submit evidence and contest the critical elements of the case. The Motion To Dismiss for lack of subject matter jurisdiction is, therefore, reviewed using the motion for summary judgment standard.

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure,* § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not ...obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the

parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed.R.Civ.P. 56(c). Having set forth the standard of review, the analysis turns to the motion to dismiss that has been converted to a motion for summary judgment.

## MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT

In the Complaint, Stables claims that, "[t]he FAA was negligent and failed in its oversight and enforcement of regulations, orders and directives of EWA's maintenance and loading procedures, certification of the elevator assembly without required redundancy on EWA DC8–71F N8079U, oversight and enforcement of regulations, directives and orders at Tennessee Technical Services ("TTS") and certification of this aircraft as airworthy and safe..." and that the FAA's negligence proximately caused Kevin Stables' death. When pressed by the Motion To Dismiss, Stables narrows the complaint to argue that the FAA was negligent when it was required to act to suspend EWA's maintenance operation and negligently failed to do so. The USA responds that the enforcement actions taken by the FAA with regard to EWA's maintenance operation all fall within the discretionary exception to the FTCA and Stables' claim should, therefore, be dismissed for a lack of subject matter jurisdiction.

The factual background giving rise to Stables' claim is now recounted in the light most favorable to Stables, the non-moving Party. The factual background is followed by a summary of the applicable provisions of the FTCA and an analysis of the Motion.

### *Factual Background*

EWA was an air cargo carrier operating under a certificate issued in 1987 by the FAA pursuant to 14 CFR Part 121. On February 16, 2000, EWA Flight 17, a McDonnell Douglas DC–8–71F, lost pitch control on takeoff. The DC–8, filled with fuel, became uncontrollable and crashed at Mather Field, California. Kevin Stables, the Captain of Flight 17, along with the other crew members were killed in the crash.

The probable cause of the crash was an improperly secured flight control bolt on the aircraft's elevator assembly. It was improperly secured either during a recent heavy maintenance check by TTS or during subsequent maintenance by EWA personnel. TTS was an FAA-certified repair station.

Prior to the crash, the FAA enforcement history against EWA was atypical according to David Hanley, FAA Flight Standards Division Manager of the Great Lakes Division. From his experience, Mr. Hanley felt that an airline of EWA's size should have had between zero and five enforcement actions against it per year. EWA had at least fifteen. (David Hanley (hereinafter "Hanley") Dep. at 87–88.) Hanley also testified that FAA statistics showed that EWA had an extensive history of operational maintenance and other self-reported complaints in addition to enforcement actions. (*Id.* at 82–83.)

However, Hanley also testified that the FAA had completed all of its required inspections. (Hanley Aff. ¶ 5.) Further, because EWA was subject to increased scrutiny, the FAA had conducted several Regional Aviation Safety Inspection Programs ("RASIPs"). (*Id.* ¶ 6.) RASIPs are special, non-recurring comprehensive inspections that are conducted by a team of FAA inspectors independent of those assigned to the day-to-day oversight of an air carrier. (*Id.*)

In the 1997–1999 time period, EWA's FAA certificate was managed at the FAA's San Jose Flight Standards Office. The Certificate Management Team there included Manager Jay Howard, Airworthiness Supervisor John Howard, Principal Operations Inspector Terje Kristiansen ("Kristiansen"), Principal Maintenance Inspector Joseph Abramski ("Abramski"), Avionics Supervisor Joyce Hitt, and Principal Avionics Inspector Nick Pearson. At the time, the members of the Certificate Management Team thought that EWA was a troubled carrier. (Jay Howard Dep. at 62; Abramski Dep. at 140; Kristiansen Dep. at 114–15.) According to Kristiansen, EWA did not, at the time, meet the requirement to obtain an air carrier certificate. (Kristiansen Dep. at 115.)

Certificate Management Team members think that there was a cultural change at EWA during the 1997–1999 time period. The culture went from one of working with the FAA to comply with safety requests to fighting the FAA at every turn. (Jay Howard Dep. at 17; Kristiansen Dep. at 75–76; Abramski Dep. at 20–21.)

There were also warnings from EWA pilots about unsafe actions and control of the airline by CNF, Inc. Captain Thomas Rachford ("Rachford"), the head of the pilots union, wrote Inspector Kristiansen in September of 1998 indicating that EWA maintenance had fallen off and that CNF was controlling the money going into aircraft parts. (Kristiansen Dep. 79–82; Dep. Ex. 11.) Rachford indicated that the monetary restrictions on maintenance must stop and, "if grounding [EWA] is the only language they understand, then so be it." (Kristiansen Dep. Ex. 11.)

In the fall of 1998, EWA CEO Kent Scott announced to Jay Howard that EWA wanted to change the FAA's supervision from San Jose to an FAA office in the FAA's Great Lakes Region. EWA had moved virtually all of its FAA regulated operations, maintenance and training functions from San Jose to Dayton, Ohio. (Hanley Aff. ¶ 4.) The reason given by EWA for the move was to get "more surveillance." (Jay Howard Dep. at 18–19; John Howard Dep. at 62; Abramski Dep. at 27–28.) Yet, the FAA inspectors at San Jose thought they were giving EWA plenty of surveillance at the time. (Abramski Dep. at 28.)

On January 22, 1999, the Certificate Management Team compiled a list of EWA violations in a memorandum to their manager, Jay Howard. (Dep.Ex. 13A.) In the letter, the Team recommended that EWA's maintenance practices be suspended and changed or that EWA be shut down completely. (*Id.*) Then, on March 18, 1999, Jay Howard, as Manager of the San Jose Flight Standards District Office ("FSDO"), wrote EWA rescinding certain maintenance program authorizations which would have shut down at least half of EWA's fleet. (Depo. Exs. 46, 47; Jay Howard Dep. 26–35.) EWA was given ten days to respond. (*Id.*) The required response time was then extended for several months to allow EWA to develop programs in response to the FAA's concerns. (Jay Howard Dep. at 31.)

After EWA's unsuccessful efforts to respond to the FAA concerns, Jay Howard rescinded the maintenance program authorizations. (Dep.Ex. 49.) The letter rescinding the maintenance program authorizations was dated December 1, 1999, and was effective ninety (90) days later. (*Id.*) However, on December 17, 1999 and before the end of the ninety-day period, the certificate of maintenance was transferred to the Cincinnati FSDO.

The maintenance program authorizations were not rescinded within the ninety-day period. (*Id.* at 32, 52–57.) Following the transfer, the Cincinnati FSDO did

heighten surveillance. (Harold R. Camden (hereinafter "Camden") Dep. at 78.) The accident that resulted in Kevin Stables and other's deaths occurred on February 16, 2000.

At the time of the transfer, the San Jose FSDO had recommended an enforcement action regarding certain enforcement investigation reports ("EIRs"). (Jay Howard Dep. at 54.) The recommendation was for suspension. (*Id.*) The FAA's legal counsel changed the suspension to a recommended $4.4 million civil penalty. (*Id.* at 55.) The package was then forwarded to the Great Lakes region. (*Id.*) However, the EIRs were eventually withdrawn by the FAA. (*Id.* at 58.)

In July 2000, the FAA convened a meeting for headquarters and regional leaders to address the public perception of the FAA, to clarify roles and responsibilities and to assess accountability. The meeting was facilitated by Cindy Zook and the notes from the meeting were made public on a website for the Professional Airway Systems Specialists. (Dep.Ex. 50.) The meeting notes reflect attendees thoughts that they were in "big trouble" regarding how they were perceived to be performing their jobs. (*Id.*) Attendees also thought that there was a disconnect between the Washington view and the field view and serious questions were being asked by the Congress and the White House regarding airline safety. (*Id.*)

EWA surrendered its operating certificate in December of 2002. (Hanley Aff. ¶ 2.) According to Hanley, The FAA's proposed revocation action, which ultimately led to EWA voluntarily surrendering its operating certificate, stemmed from an October–November 2000 RASIP, a May–June 2001 special inspection, incident investigations and ongoing surveillance. (Hanley Aff. ¶ 8.)The analysis now turns to the applicable provisions of the FTCA.

### Applicable Provisions of the FTCA

■ This is a lawsuit brought against the United States government. However, the United States government cannot be sued without its consent. *Montez ex rel. Estate of Hearlson v. United States,* 359 F.3d 392, 395 (6th Cir.2004)(citing *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976)).

"Pursuant to the FTCA, the United States has consented, subject to certain exceptions, to suit for damages for personal injuries caused by the negligence of government employees acting within the course and scope of their employment." *Id.* at 395. One of the exceptions to consent to a suit for damages is the discretionary function exception. *Id.* The purpose of the discretionary function exception is to "insulate[ ] the government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)

■ The discretionary function exception provides that the United States has not consented to suit where the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Montez,* 359 F.3d at 395 (quoting *Rosebush v. United States,* 119 F.3d 438, 440 (6th Cir.1997)). Because the United States has not waived its sovereign immunity with regard to discretionary functions, courts lack subject matter jurisdiction over acts that fall within the exception. *Id.*

■ The United States Supreme Court has set forth a two-part test to determine

whether a governmental act falls within the discretionary function exception. *Id.* (citing *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). First, the court must ask whether the act involves "an element of judgment or choice." *Id.* Said another way, "is the actor authorized to make decisions, or is a specific action required in all cases?" *Myers v. United States*, 17 F.3d 890, 895 (6th Cir.1994). The discretionary function exception does not apply when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow. *Montez*, 359 F.3d at 395.

If the answer to this first question is "yes," then the court must ask "whether that judgment is one of the kind that the discretionary function exception was designed to shield." *Id.* The exception was designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

■ Therefore, only choices grounded in the social, economic or political goals of the statute and regulations are protected. *U.S. v. Gaubert*, 499 U.S. 315, 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). Said another way, the second question is whether the action is susceptible to policy analysis. *Id.* at 324–25, 111 S.Ct. 1267. If both questions are answered "yes," the governmental act falls within the discretionary function exception.

The caselaw offers several examples of actions grounded in regulatory policy that fall within the discretionary function exception. Decisions like the regulation and oversight of savings & loans by the Federal Home Loan Bank Board, *Gaubert*, 499 U.S. at 332–34, 111 S.Ct. 1267, the release of vaccine lots by the Bureau of Biologics of the Food and Drug Administration, *Berkovitz*, 486 U.S. at 545–48, 108 S.Ct. 1954, and the enforcement and implementation of airline safety standards by the FAA, *Varig* 467 U.S. at 814–20, 104 S.Ct. 2755, are the kinds of decisions Congress empowered agencies to make and are subject to the discretionary function exception. *O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir.2002). In *Varig*, the Supreme Court specifically held that, "when an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig*, 467 U.S. at 819–20, 104 S.Ct. 2755.

The caselaw also offers examples of actions that do not fall within the discretionary function exception. The discretionary function exception does not apply when the agency ignored blatant safety hazards that could have been repaired through routine periodic maintenance mandated by explicit policy. *Mitchell v. United States*, 225 F.3d 361, 364 (3rd Cir.2000) (citing *ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir.1987)), *cert. denied*, 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001). In *Mitchell*, the basis for denying application of the exception was that the agency decision goes beyond the ambit of appropriate discretion because the challenged government activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations. *Id.* In another example, the exception was not applicable because the Navy did not function within the ambit of statutory agency discretion when it failed to provide a handrail while requiring an employee to negotiate a steep unlighted 20 feet long path where there was evidence that two or three years before the accident the Navy had been

asked to install a handrail. *Id.* (citing *Gotha v. United States,* 115 F.3d 176, 181 (3rd Cir.1997)). Having set forth the parameters of the discretionary function exception the analysis turns to the USA's Motion.

### Analysis of the Motion

Stables' Complaint is brought pursuant to the FTCA and alleges that the FAA was negligent in its oversight and enforcement of regulations with regard to EWA. The USA seeks dismissal of this Complaint arguing that the FAA's actions fall within the discretionary function exception to the FTCA. Stables opposes dismissal and responds that the FAA's actions with regard to EWA do not fall within the discretionary function exception.

Stables argues that the discretionary function exception does not apply because the FAA was required to take action against EWA as a non-compliant carrier. Stables further argues that, once the FAA decided to take action, it had a duty to carry out the action in a non-negligent manner. Stables' argument will be analyzed using the two-part test established to determine whether a governmental act falls within the discretionary function exception.

### 1. Does the Act Involve an Element Of Judgment Or Choice?

The first part of the test is to determine whether the act involves an element of judgment or choice. The discretionary function exception does not apply when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow.

Actions by the FAA are at issue here. The Federal Aviation Act of 1958 directs the Secretary of Transportation to promote safety in air transportation by promulgating reasonable rules and regulations governing the inspection, servicing and overhaul of civil aircraft. *Varig,* 467 U.S. at 797, 104 S.Ct. 2755. The Secretary of Transportation, in his or her discretion, may prescribe the manner in which the inspection, servicing and overhaul will be made. *Id.* In the exercise of this discretion, the FAA, as the Secretary's designee, has devised a system of compliance and enforcement. *Id.*

Compliance and enforcement is implemented through a system of FAA orders. Stables identifies FAA Order 2150.3A (the "FAA Order") as the source of the prescribed course of action that FAA employees were to follow and failed to follow in this case. This particular FAA Order describes the FAA's compliance and enforcement program.

The FAA Order provides that the FAA's central mission is "to promote aviation safety and security in civil aeronautics." FAA Order 2150.3A ¶ 201a. It further provides that "FAA personnel must take the action most appropriate to achieve future compliance." FAA Order 2150.3A ¶ 201c.

"An important element of an effective compliance program is the prompt discovery of instances of noncompliance." FAA Order 2150.3A ¶ 202c. Therefore, "there must be a particularly high level of surveillance of air carrier operations." *Id.*

The FAA Order also provides procedures for selecting compliance and enforcement action. With regard to compliance and enforcement, the initial priorities of FAA personnel are "to correct any ongoing noncompliance and to take appropriate action when they determine that a certificate holder lacks the requisite qualifications or competency." FAA Order 2150.3A ¶ 204a.

Finally, the FAA Order provides for sanctions. In general, the FAA uses certificate actions to enforce its regulations.

FAA Order 2150.3A ¶ 206a. The FAA may, however, in its discretion, take civil penalty actions. *Id.* Finally, the FAA will take remedial action as needed where there is a need to prevent continuing violations. *Id.*

What is not specifically identified by Stables but is included in the FAA Order is a statement at the beginning under "Purpose" that "[i]t is expected that FAA personnel will use their judgment and experience in each case to carry out the policies of the FAA." FAA Order 2150.3A ¶ 100. The FAA Order also indicates that the FAA has a "wide range of options available for addressing violations." FAA Order 2150.3A ¶ 202f. Finally, Chapter 4 regarding the investigation of violations "furnishes the inspector with general guidelines for an investigation" that "are not all inclusive and are not a substitute for common sense and good judgment." FAA Order 2150.3A ¶ 400.

The FAA Order requires the FAA to take the action most appropriate to achieve future compliance, to effect a high level of surveillance of air carrier operations, to correct ongoing noncompliance, to take appropriate action when a certificate holder lacks the requisite qualifications or competency, and to take remedial action as needed where there is a need to prevent continuing violations. However, these requirements are of a general nature.

The FAA Order gives FAA officials little if any guidance as to a specific course of action. Thus FAA officials have discretion in deciding how to accomplish these requirements. In fact, the FAA Order expects FAA personnel to use their judgment and experience in each case to carry out these policies and guidelines regarding the investigation of violations. The guidelines, according to the FAA Order, are not all inclusive and are not a substitute for common sense and good judgment. Said

another way, these policy statements and general guidelines are not specific mandates because they leave FAA officials discretion in how to accomplish their work. *See, e.g. Varig Airlines*, 467 U.S. at 821, 104 S.Ct. 2755 (the FAA's statutory duty to promote safety in air transportation did not remove discretion from inspectors); *Montez*, 359 F.3d at 396 (statute requiring Bureau of Prisons to provide for safekeeping and protection of inmates is not a specific and mandatory directive). Therefore, Stables has not identified regulations that prescribe a specific course of action for an employee to follow. In addition, the FAA actions about which Stables complains involve an element of judgment or choice. The analysis now turns to the second part of the test to determine whether a governmental act falls within the discretionary function exception.

### 2. Is the Judgment One Of the Kind That the Discretionary Function Exception Was Designed To Shield?

The second part of the test regarding the discretionary function exception is to determine whether the judgment exercised is one of the kind that the discretionary function exception was designed to shield. The judgment exercised is one that the exception was designed to shield if the nature of the action is susceptible to policy analysis.

To avoid the exception under this part of the test, Stables argues that, once the FAA decided to take action, it had a duty to carry out the action in a non-negligent manner. In support of this argument, Stables says that several courts have held that while the government cannot be held liable for making a decision whether or not to act, once a decision to act is made, the government is obligated to act only with due care.

Stables' claim in this case is similar to the claim faced by the U.S. Supreme Court in *Varig*. In *Varig*, the owner of a commercial aircraft brought an action against the FAA seeking damages for a destroyed aircraft which was consolidated with a wrongful death claim arising from the same facts and circumstances. The action was brought in tort based upon the FAA's alleged negligence in failing to check certain specific items in the course of certifying certain aircraft for use in commercial aviation. The plaintiffs in *Varig* argued that the FAA was negligent when it inspected an aircraft and issued a type certificate. The action here is a wrongful death claim based upon the FAA's alleged negligence in the oversight and enforcement of regulations. Although the regulations in question in *Varig* involved the design of an aircraft and the regulations in this case involve maintenance of aircraft, the FAA was enforcing its regulations in both cases.

In *Varig*, the U.S. Supreme Court determined that "[t]he FAA's implementation of a mechanism for compliance review is a discretionary activity protected by the discretionary activity clause." 467 U.S. at 819, 104 S.Ct. 2755. When an agency like the FAA determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory activity "of the most basic kind." *Id.* at 819–20, 104 S.Ct. 2755. This is because decisions as to the manner of enforcing regulations require the agency involved to establish priorities by balancing the objectives sought "against such practical considerations as staffing and funding." *Id.* at 820, 104 S.Ct. 2755.

■■■ Here, as in *Varig*, the FAA was exercising the kind of discretionary regulatory activity that the discretionary exception was designed to shield. Here, the FAA was exercising regulatory activity involving the compliance with and enforcement of FAA rules. The FAA's enforcement of its rules here is subject to the establishment of priorities based upon practical considerations such as staffing and funding just as the FAA supervision in *Varig* was subject to these same practical considerations.

In addition to the similarity of this case to *Varig*, the caselaw provides another similarity. The FAA Order at issue here is similar to the regulation subject to judicial review in *Gaubert*.

In *Gaubert*, the U.S. Supreme Court found that the discretionary exemption applied to a regulation which authorized the Federal Home Loan Bank Board (the "FHLBB") to regulate the activities of federal savings and loan associations. *Gaubert*, 499 U.S. at 329, 111 S.Ct. 1267. Specifically, the FHLBB was authorized to use judgment as to when to institute proceedings against financial institutions and what mechanisms to use. *Id.* The U.S. Supreme Court based its finding on the tenet that, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id.* at 324, 111 S.Ct. 1267.

Here, the FAA officials have discretion in deciding how to accomplish the requirements set forth in the FAA Order. The FAA Order expects FAA personnel to use their judgment and experience in each case to carry out the FAA's policies. Further, guidelines regarding the investigation of violations, according to the FAA Order, are not all inclusive and are not a substitute for common sense and good judgment.

Based upon application of the *Varig* and *Gaubert* decisions to this case, there is a

strong presumption that the FAA actions here are subject to policy considerations and are the type of actions that the discretionary exception was designed to shield. In the face of this presumption, Stables argues that once the FAA decided to act with regard to EWA, it was required to act with due care.

■ Stables cites several cases applying the Restatement (Second) of Torts § 323, otherwise known as the Good Samaritan Doctrine, in support of its argument that, once the FAA decided to act, it was required to act with due care. This section of the Restatement provides that:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his under taking if,

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

*Restatement of the Law Second Torts 2d,* § 323.

First, this section of the Restatement of the Law of Torts is not applicable to this case. In this case, there is no evidence that the FAA undertook to render services to benefit Kevin Stables or that Kevin Stables relied upon the FAA's undertaking with regard to EWA.

"The duty to ensure that an aircraft conforms to FAA safety regulations lies with the manufacturer and operator, while the FAA retains responsibility for policing compliance." *Varig,* 467 U.S. at 797, 104 S.Ct. 2755. The specific regulation upon which Stables relies, the FAA Order, describes the FAA's compliance and enforcement program, the purpose of which is to promote compliance with FAA requirements. Therefore, the FAA did not undertake to render services to Kevin Stables. The FAA undertook to promote compliance with its regulations. EWA was responsible for conforming to those regulations and arguably responsible to Kevin Stables. See, e.g., *Varig,* 467 U.S. at 821, 104 S.Ct. 2755 ("The FAA has a statutory duty to promote safety in air transportation, not to insure it.").

■ Further, the government is not liable under the Good Samaritan doctrine for any negligence where the regulation upon which the plaintiff relies precludes reasonable reliance by the plaintiff. *Moody v. United States,* 774 F.2d 150, 157 (6th Cir.1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 65, 93 L.Ed.2d 24 (1986). In this case, the regulation upon which Stables relies places responsibility on EWA for ensuring that its aircraft conform to FAA regulations. Therefore, Kevin Stables may arguably be entitled to rely upon EWA but he was not entitled to rely upon the services rendered by the FAA.

In addition to the inapplicability of the Good Samaritan Doctrine, the cases cited by Stables are not relevant. They are not relevant because they do not stand for the proposition that the judgment exercised by the FAA in this case is not one of the kind that the discretionary function exception of the FTCA was designed to shield. Each case cited by Stables was an FTCA case. However, in none of the cases was the court addressing the discretionary function exception. In the cases cited by Stables, the court was addressing the government's alleged negligence and not whether the court had subject matter jurisdiction. See e.g., *Hurd v. United States,* 34 Fed.Appx. 77, 2002 WL 730284 (4th Cir.2002)(Coast Guard's conduct that worsened the position of the decedents was negligent);

*United States v. DeVane,* 306 F.2d 182 (5th Cir.1962)(Coast Guard's conduct in undertaking a rescue engendered reliance thereon and must, therefore be conducted with reasonable care); *United States v. Lawter,* 219 F.2d 559 (5th Cir.1955)(where Coast Guard affirmatively took over rescue operations, it was obliged not to injure persons being rescued by negligent performance of rescue operations); *Indian Towing Company, Inc. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)(once Coast Guard exercised its discretion to operate lighthouse and engendered reliance on guidance afforded by the light, the Coast Guard was obligated to use due care in operating the lighthouse). The U.S. Supreme Court has later said that its findings in *Indian Towing* do not apply to discretionary function cases. *Gaubert,* 499 U.S. at 326, 111 S.Ct. 1267; *see e.g., Thames Shipyard and Repair Company v. United States,* 350 F.3d 247, 255 (1st Cir. 2003)(the discretionary function exception was not at issue and there was no exercise of policy judgment in Indian Towing), *cert. denied,* —— U.S. ——, 124 S.Ct. 2849, 159 L.Ed.2d 269 (2004).

In addition to the inapplicability of the Good Samaritan Doctrine and the irrelevancy of the cases cited by Stables, there is caselaw supporting the conclusion that the FAA's actions in this case are the type of actions that the discretionary function exception was designed to shield. According to the Ninth Circuit, the adoption and enforcement of FAA rules is grounded in the 'social, economic and political' policies of assuring air safety. *Roundtree v. United States,* 40 F.3d 1036, 1039 (9th Cir. 1994). In addition, the United States District Court for the District of Columbia found that decisions involving investigations of air safety complaints fall within the discretionary function exception. *Sottile v. United States,* 608 F.Supp. 1040, 1043 (D.D.C.1985). Therefore, the judg-ment being exercised by the FAA in this case is of the kind that the discretionary function exception was designed to shield.

## CONCLUSION

The USA's Motion To Dismiss for lack of subject matter jurisdiction is converted to a Motion for Summary Judgment. The Parties have conducted the discovery that they requested. The Motion has been fully briefed and is ripe for decision.

Summary judgment is granted when the plaintiff fails to establish a genuine issue with regard to a fact that is essential both to subject matter jurisdiction and to the merits of a claim. Remaining genuine issues of material fact are for the finder of fact.

The USA argues that Stables' lawsuit falls within the discretionary function exception of the FTCA and must, therefore, be dismissed for lack of subject matter jurisdiction. The two-part test set forth by the U.S. Supreme Court is used to determine whether the actions about which Stables complains fall within the discretionary function exception.

The first part of the test is whether the action in question involves an element of judgment or choice. In this case Stables identifies FAA Order 2150.3A as the source of the prescribed course of action that FAA employees were to follow. There are no genuine issues of material fact and the actions about which Stables complains with regard to FAA Order 2150.3A involve an element of judgment or choice. Therefore, the first part of the test is satisfied.

The second part of the test is whether the judgment exercised is one of the kind that the discretionary function exception was designed to shield. There are no genuine issues of material fact and the judgment exercised by the FAA in enforcing

FAA Order 2150.3A is judgment that the discretionary function exception was designed to shield. Therefore, both elements of the test are satisfied.

There are no genuine issues of material fact and the discretionary function exception to the Federal Tort Claims Act excludes the USA's liability for the FAA actions taken pursuant to FAA Order 2150.3A. Therefore, Stables' Complaint is DISMISSED for lack of subject matter jurisdiction. The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.